# United States Court of Appeals
*for the*
# Eighth Circuit

---

Case No. 24-3619

RHONDA BURNETT, *et al.*,

*Plaintiffs-Appellees,*

– v. –

NATIONAL ASSOCIATION OF REALTORS, *et al.*,

*Defendants-Appellees,*

KELLER WILLIAMS REALTY, INC., *et al.*,

*Defendants,*

BHH AFFILIATES, LLC, *et al.*,

*Defendants-Appellees,*

RE/MAX LLC,

*Defendant,*

– v. –

BROWN HARRIS STEVENS, *et al.*,

*Intervenors-Appellees,*

– v. –

JAMES MULLIS,

*Objector-Appellant,*

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI - KANSAS CITY, NO. 4:19-CV-00332-SRB.
THE HONORABLE STEPHEN R. BOUGH, JUDGE PRESIDING.

---

## BRIEF FOR OBJECTOR-APPELLANT

---

GEORGE A. ZELCS
RANDALL P. EWING, JR.
RYAN Z. CORTAZAR
KOREIN & TILLERY
205 North Michigan Avenue,
    Suite 1950
Chicago, Illinois 60601
(312) 641-9750

VINCENT BRIGANTI
MARGARET MACLEAN
NOELLE FORDE
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, New York 10601
(914) 997-0500

*Counsel for Objector-Appellant*

## SUMMARY OF THE CASE

This case concerns the proper application of Rule 23's standards for approving class action settlements. Two *separate* classes of victims brought *separate* suits in *separate* courts asserting *separate* sets of claims derived from *separate* transactions—one pertaining to their home purchases and another relating to their home sales. These groups litigated independently for years. At the last moment, Plaintiffs litigating the home sales claims not only purported to settle the claims in that litigation, but also to release separate claims pertaining to home purchases, without providing adequate representation to homebuyers nor any commitment that they would receive compensation from the settlement fund for their valuable claims. In approving this arrangement, the district court failed to analyze the settlement under the factors codified in the 2018 Amendment to Rule 23 that are calibrated to prevent such inequity.

Mullis requests fifteen minutes of oral argument to explain why this Court should adopt the Rule 23 safeguards consistent with its precedent and implemented in other circuits.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ................................................................. i

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUES ........................................................ 2

INTRODUCTION ............................................................................. 4

STATEMENT OF THE CASE ........................................................... 6

    I.    Factual Background ............................................................ 6

    II.    Procedural Background ...................................................... 9

    III.    The District Court's Settlement Approval Order ............. 15

SUMMARY OF THE ARGUMENT ................................................ 16

ARGUMENT ................................................................................. 21

    I.    Standard of Review .......................................................... 21

    II.    The Settlements Failed to Satisfy Rule 23(e)(2) .............. 23

        A.    The District Court Misapplied the Intraclass Equity

              Requirement ................................................................ 25

        B.    The Releases Improperly Extinguish Homebuyer Claims

              Without an Identical Factual Predicate ........................... 30

        C.    Class Counsel Provided Inadequate Representation for

              Class Members' Homebuying Claims ............................... 40

III.   The Releases Do Not Touch Mullis's Homebuying Claims

.............................................................. 45

IV.   Mullis Preserved His Objection ........................................ 48

CONCLUSION ................................................................. 52

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amchem Prod., Inc. v. Windsor,*
  521 U.S. 591 (1997) ................................................................. *passim*

*In re Apple Inc. Device Performance Litig.,*
  50 F.4th 769 (9th Cir. 2022) ............................................... 24

*Askew v. United States,*
  680 F.2d 1206 (8th Cir. 1982) ............................................. 22

*Batton v. The Nat'l Ass'n of Realtors,*
  No. 1:21-cv-00430 (N.D. Ill.) ............................................... 10

*Black Clawson Co. v. Kroenert Corp.,*
  245 F.3d 759 (8th Cir. 2001) ............................................... 22

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406,*
  85 F.4th 1070 (11th Cir. 2023) ........................................... 24

*Cromeans v. Morgan Keegan & Co.,*
  859 F.3d 558 (8th Cir. 2017) ............................................... 23

*Davis v. Hanna Holdings, Inc.,*
  No. 24CV2374, 2025 WL 845918 (E.D. Pa. Mar. 18, 2025) .......... 10, 11

*Degen v. United States,*
  517 U.S. 820 (1996) .............................................................. 48

*Dietz v. Bouldin,*
  579 U.S. 40 ........................................................ 3, 20, 48, 49

*In re Domestic Airline Travel Antitrust Litig.,*
  378 F. Supp. 3d 10 (D.D.C. 2019) ....................................... 28

*Dunn Indus. Grp., Inc. v. City of Sugar Creek,*
  112 S.W.3d 421 (Mo. 2003) ................................................. 46

iv

*In re General American Life Insurance Co. Sales Practices Litigation*,
    357 F.3d 800 (8th Cir. 2004) ...................................................... *passim*

*Hammond Packing Co. v. State of Ark.*,
    212 U.S. 322 (1909) ............................................................. 50

*Hesse v. Sprint Corp.*,
    598 F.3d 581 (9th Cir. 2010) ................................................. 34

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982) (2016) ............................................... 3, 50

*Keltner v. Keltner*,
    589 S.W.2d 235 (Mo. 1979) ................................................. 45

*In re Literary Works in Electronic Databases Copyright Litigation*,
    654 F.3d 242 (2d Cir. 2011) ....................................... 2, 42, 43

*Matsushita Elec. Indus. Co. v. Epstein*,
    516 U.S. 367 (1996) ................................................... 3, 31, 35

*Moehrl v. Nat'l Ass'n of Realtors*,
    No. 19-CV-01610, 2020 WL 5260511 (N.D. Ill. May 30, 2020) ................................................................................. 11

*Moses v. New York Times Co.*,
    79 F.4th 235 (2d Cir. 2023) ................................................. 24

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
    660 F.2d 9 (2d Cir. 1981) .......................................... 3, 31, 32

*Nottingham Partners v. Trans-Lux Corp.*,
    925 F.2d 29 (1st Cir. 1991) ................................................. 35

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999) ........................................... 2, 20, 23, 42

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) .............................................. 22

*Prof. Firefighters Ass'n of Omaha, Local 385 v. Zalewski,*
    678 F.3d 640 (8th Cir. 2012) ................................................. 2

*Roadway Exp., Inc. v. Piper,*
    447 U.S. 752 (1980) ............................................................ 49

*Robert F. Booth Trust v. Crowley,*
    687 F.3d 314 (7th Cir. 2012) ............................................... 49

*Roes, 1-2 v. SFBSC Mgmt., LLC,*
    944 F.3d 1035 (9th Cir. 2019) ............................................. 24

*In re T-Mobile Cust. Data Sec. Breach Litig.,*
    111 F.4th 849 (8th Cir. 2024) ................................... 3, 49, 50

*Thompson v. Edward D. Jones & Co.,*
    992 F.2d 187 (8th Cir. 1993) ......................... 36, 37, 38, 48

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab.*
*Litig.,*
    716 F.3d 1057 (8th Cir. 2013) ........................................ 3, 31

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
    396 F.3d 96 (2d Cir. 2005) ..................................... 38, 39, 48

## Other Authorities

Fed. R. Civ. P. 23(e)(2) ..................................................... *passim*

Restatement (Second) of Judgments § 24 (1982) ................. 33

Fed. R. Civ. P. 37 ............................................................... 50

# JURISDICTIONAL STATEMENT

The United States District Court for the Western District of Missouri had subject matter jurisdiction over this case alleging violations of federal antitrust statutes under the general grant of federal question jurisdiction and specific antitrust jurisdictional grants. 28 U.S.C. §§ 1331, 1337, and 15 U.S.C. §§ 15, 26.

The United States Court of Appeals for the Eighth Circuit has jurisdiction to decide this appeal under 28 U.S.C. § 1291. On November 27, 2024, the district court issued an order approving settlements between the Plaintiff and the Settling Defendants (collectively the "Appellees"), but left ambiguous whether it directed a final judgment. App. 633; R. Doc. 1622, at 87. The district court entered final judgment pertaining to the Settling Defendants on January 15, 2025. App. 789; R. Doc. 1673, at 1; App. 793; R. Doc. 1674, at 1. Anticipating this action and preserving his rights, Appellant James Mullis—a class member who had objected that the settlements extinguished his homebuying claims—filed a timely notice of appeal on December 24, 2024.

# STATEMENT OF THE ISSUES

1. Where a class settlement extinguishes without evidence of adequate
   compensation a valuable set of unique claims that the settling
   plaintiffs and their counsel had never previously elected to litigate,
   did the district court err by not properly considering if the agreement
   "treats class members equitably relative to each other" and whether
   homebuyer interests were "adequately represented" under Rule
   23(e)(2)?

## Relevant Authority

   a. Rule 23(e)(2)(A)-(D), 2018 Amendment
   b. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999)
   c. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)
   d. *In re Literary Works in Electronic Databases Copyright Litigation*,
      654 F.3d 242 (2d Cir. 2011)
   e. *Prof. Firefighters Ass'n of Omaha, Local 385 v. Zalewski*,
      678 F.3d 640 (8th Cir. 2012)

2. Did the district court err when it enjoined class members from
   pursuing their ongoing homebuyer claims, even though those claims
   lack an "identical factual predicate" with the separately litigated
   home-seller claims as required by the terms of the settlement itself
   and Rule 23?

**Relevant Authority**

    a. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367 (1996)
    b. *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057 (8th Cir. 2013)
    c. *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981)

3. Did the district court exceed its inherent authority when it held that Mullis waived his objection by not appearing in person despite the class notice specifically providing that he need not attend the fairness hearing to perfect his objection?

**Relevant Authority**

    a. *Dietz v. Bouldin*, 579 U.S. 40 *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982) (2016)
    b. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982)
    c. *In re T-Mobile Cust. Data Sec. Breach Litig.*, 111 F.4th 849 (8th Cir. 2024)

# INTRODUCTION

Defendants, together with their many co-conspirators, fixed real estate broker commissions and harmed millions of homebuyers and sellers across the country. To remedy the separate injuries suffered on both sides of home sales, buyers and sellers elected to pursue separate class cases alleging different injuries in separate courts. For years, the buyers and sellers litigated their cases completely independently. Sellers' counsel never sought to consolidate or relate the buyer and seller cases. Sellers' counsel never alleged, analyzed, or otherwise litigated claims on behalf of or injuries to buyers. And they never sought to intervene or appear in the buyer cases. Then, out of the clear blue sky, the Defendant-Appellees and the home-seller Plaintiffs' counsel ("Settling Plaintiffs' Counsel") purported to settle not only the home-selling claims they had been litigating—they also purported to release all of the class's home*buying* claims. Despite purportedly releasing homebuying claims, the settling parties did not submit any plan of allocation and did not reference or request any information whatsoever regarding class members' home purchases.

The result is that the minority of class members who sold but did not buy homes during the class period (such as inheritors) were fully compensated for their injuries. The rest of the class had their home-buying claims settled out from under them ostensibly for free—claims that they are actively (and successfully) litigating separately. This imbalance exposes a fundamental class conflict.

Yet the district court rubber-stamped the settlements with no evidence that homebuyers' interests were adequately represented (if at all), no evaluation of intraclass equity, no recognition that claims requiring unique proof (like homebuyers' claims) share a different factual predicate, and no evidence of compensation to homebuyers.

Rule 23 and longstanding precedent require separate representation for conflicting interests like those presented here—the same arrangement that buyers and sellers elected at the outset of these cases in filing and litigating them separately via separate sets of counsel. In this case, only separate representation for buyers and sellers can ensure that buyers' and sellers' competing interests receive proper weight in the settlement balance. To remedy this inequity, this Court should reverse the district court's approval order and exclude

homebuyer claims from the settlements. Alternatively, this Court

should appoint Objector's counsel to represent homebuyer claims in

these and any future negotiations or settlements in this case.

## STATEMENT OF THE CASE

## I.  Factual Background

For more than 25 years, homebuyers such as Appellant James

Mullis paid inflated home prices resulting from the Defendants'

antitrust conspiracy. Defendant-Appellee National Association of

Realtors ("NAR") promulgated regulations at the center of this

conspiracy, unlawfully restraining trade in the housing markets by

fixing broker commissions and making them all but impossible to

negotiate. *See generally* 3d Amended Class Action Compl., App. 216-70;

R. Doc. 759, at 1-55. Large brokerage companies like Defendant-

Appellee HomeServices, in turn, required their brokers to maintain

NAR membership and to implement the unlawful regulations across the

housing market. App. 243-46; R. Doc. 759, at 28-31, ¶¶ 74-84.

The Defendants' unlawful regulations affected both homebuyers

and home-sellers, but they more directly targeted homebuyers like

Appellant James Mullis. NAR rules allowed brokers representing

homebuyers to claim that broker services were free, even though buyer

brokers received a large cut of the money that the buyers paid to

purchase their homes. App. 234-35; R. Doc. 759, at 19-20, ¶¶ 41-45.

Although buyers did not pay their agents directly, the money they paid

for their homes flowed automatically to brokers through arrangements

with sellers' brokers. App. 234-35; R. Doc. 759, at 19-20, ¶¶ 41-45. NAR

regulations targeted that arrangement by prohibiting buyers' brokers

from negotiating commission rates as part of buyers' offers to sellers.

App. 239-40; R. Doc. 759, at 24-25, ¶ 63.

The Defendants further handicapped homebuyers by prohibiting

them from seeing commission rates online, even though those rates

were fully visible to the brokers when searching online listings. App.

253-54; R. Doc. 759, at 38-39, ¶¶ 102-03. In fact, home-listing software

used by the Defendants allowed buyers' brokers to filter out homes with

lower broker rates, making it more difficult for buyers to ever know

those listings exist. App. 252; R. Doc. 759, at 37, ¶ 99.

Examining the effects of these unlawful practices on buyers, the

Department of Justice explained that "the cost of both the buyer's

broker and the seller's broker is therefore embedded in the purchase

price of a home" and that inflated commissions harm "buyers (who end up paying through higher home purchase prices)." Statement of Interest of the United States, App. 572; R. Doc. 1561-7, at 8. According to the DOJ, "the buyer-broker commission has a very real cost to homebuyers, who ultimately pay through higher purchase prices." App. 572; R. Doc. 1561-7, at 8.

This explanation recognizes that, relative to sellers, buyers operated in the dark. Sellers at least understood the precise percentage of the purchase price paid to the brokers. That knowledge allowed home-sellers to bake the commissions into their asking prices, passing on artificially high broker fees to homebuyers through inflated home prices.

Buyers, however, lacked that knowledge and power entirely. The NAR rules erected informational and transactional barriers that deprived buyers of the ability to offset or pass on their harm. Because the Defendants obscured the commission rates they set with sellers, buyers lacked the knowledge to understand how that markup was incorporated into sellers' bottom lines. And even if they did know, NAR

rules still prevented buyers from negotiating that rate lower. App. 239-40; R. Doc. 759, at 24-25, ¶ 63.

These unlawful practices also created perverse incentives for buyers' brokers that harmed their clients. Because buyers' brokers received a percentage of the total home purchase price, they were motivated to persuade homebuyers to pay the highest price possible to maximize their own compensation. This created a transactional imbalance where three parties were working at cross purposes to the buyer: the seller, seller's broker, and buyer's broker all benefited from the buyer paying the highest amount possible. The buyer stood alone in benefiting from a lower price and was further handicapped by the informational disadvantages that the Defendants imposed on buyers. For all these reasons, buyers chose to litigate their specific claims separately.

## II.    Procedural Background

James Mullis and other homebuyers have been litigating their class action against the Defendant-Appellees for over four years, prosecuting unique claims on behalf of homebuyers. App. 419; R. Doc. 1561, at 3. The Defendant-Appellees, too, have been actively litigating

the homebuyer cases—completely separately from any of the seller cases.

James Mullis's lawsuit on behalf of homebuyers was first filed on January 25, 2021. *See* App. 419; R. Doc. 1561, at 3 (*Batton v. The Nat'l Ass'n of Realtors* ("*Batton I*"), No. 1:21-cv-00430 (N.D. Ill.)). Since that time, Mullis and the named *Batton I* plaintiffs have expended substantial time and resources vigorously advocating on behalf of the homebuyers and their unique claims.

As a result, courts presiding over homebuyer claims have repeatedly found them to have merit. For example, the Northern District of Illinois denied defendants' motions to dismiss, finding that homebuyer plaintiffs plausibly allege that there is a "single, straight-line path by which the commission is passed through to the homebuyer" in the form of higher home prices. *Batton*, 2024 WL 689989, at *8 (N.D. Ill. Feb. 20, 2024) (sustaining 32 state law antitrust and consumer protection claims and nationwide unjust enrichment claims); *see also Davis v. Hanna Holdings, Inc.*, No. 24CV2374, 2025 WL 845918, at *15 (E.D. Pa. Mar. 18, 2025) (holding homebuyer plaintiffs properly pleaded standing as to all state law claims because plaintiffs sufficiently

pleaded that the alleged conduct "caused them antitrust injuries" and because it is "easy to understand how inflated commissions would result in inflated home prices"). Indeed, the Eastern District of Pennsylvania found that "Plaintiffs' allegations suggest that they have suffered the *greatest*, if not the most direct, injury of alleged antitrust conspiracy, since they received worse services and paid higher prices than they otherwise would, while sellers came out even after passing on the supracompetitive fees." *Davis*, 2025 WL 845918, at \*15 (emphasis added).

The Appellees always maintained a firm wall between the buyer and seller cases. The Settling Plaintiffs filed their cases on behalf of home-sellers, making no mention of any harm to homebuyers. At no point thereafter did they purport or attempt to represent homebuyers' claims. *E.g.*, App. 217, 258-59; R. Doc. 759, at 2, 43-44, ¶¶ 1, 118-20; *Moehrl v. Nat'l Ass'n of Realtors*, No. 19-CV-01610, 2020 WL 5260511, at \*1 (N.D. Ill. May 30, 2020). Sellers' counsel never sought to consolidate or relate the cases nor to intervene in the buyer cases. For example, Settling Plaintiffs' counsel excluded Mullis's lawsuit from their motion to centralize pretrial discovery in home-seller lawsuits

before the Judicial Panel on Multidistrict Litigation because according to Settling Plaintiffs' counsel, they "differ" from home-seller claims. App. 553; R. Doc. 1561-6, at 12. Their class certification and summary judgment briefing does not argue or analyze harm to homebuyers. Similarly, Defendants repeatedly argued to homebuyer plaintiffs that discovery in the home-seller cases was not relevant to buyer claims. App. 762; R. Doc. 1640, at 42. Yet the Settling Plaintiffs and their counsel now wish to be trusted as zealous advocates for homebuyer claims, a position that is undermined by their prior actions and statements.

As with the first round of settlements for which Settling Plaintiffs' sought approval, the settlements and related documents filed with the district court contain no plan of distribution, making it impossible to determine how the funds will be distributed. All evidence indicates that funds will be distributed based solely on homes that class members sold. For example, the claim form approved and posted on the settlement website asks only for information about the "home sold" by the claimant, with no inquiry into home purchases. *See* Claim Form Section B, App. 631; R. Doc. 1595-7, at 100.

Mullis objected to the settlements. He argued that the releases should not be read to cover his homebuyer claims because the underlying transactions at issue in this case had always been class members' home *sales*, not their *purchases*. App. 421-23; R. Doc. 1561, at 5-7. He also showed that the actions of the settling parties, such as their express exclusion of homebuyer claims from their motion before the JPML, indicated that they did not intend for the agreements to resolve his pending claims. App. 422-23; R. Doc. 1561, at 6-7. Finally, Mullis argued that if the releases did cover his homebuying claims, then the district court should reject the settlements because class counsel and named plaintiffs had not adequately represented homebuyer claims and because final resolution was inequitable without a plan of allocation demonstrating that homebuyers' claims had received fair consideration. App. 423-26; R. Doc. 1561, at 7-10.

After Mullis filed his objection, on November 4, 2024, the district court ordered *sua sponte* that all objectors appear in person at the November 26 fairness hearing. App. 598; R. Doc., 1566. That order contradicted the long-form class notice that explicitly answered the question, "Do I have to come to the hearing? No. . . . If you send an

objection, you do not have to come to court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend if you wish." App. 613; R. Doc. 1595-7, at 82. Mullis' counsel appeared at the hearing on his behalf.

At the final approval hearing for settlements against other defendants in a related case (the appeal of which has been consolidated with this case) on October 31, 2024, the district court explained its reason for contradicting the notice provided to class members: "I got a somewhat alarming objection that accused me of criminal acts, and so turned that over to the U.S. Attorney." Mot. Ex. 1 at 3.[1] While the district court stated, "[s]o I'm not lumping everybody into that category, but forgive me if I'm a little bit suspect in this particular matter given when I got to turn over information to the U.S. Attorney's office because of accusations of federal crimes," Mot. Ex. 1 at 4, the district court in fact found that every single objector who appeared solely through

---

[1] All references to "Mot. Ex." refer to the exhibits filed with Mullis's motion for judicial notice filed concurrently with this brief on April 21, 2025.

counsel had waived their objection, App. 649; R. Doc. 1622, at 17. In the final approval hearing for this case, just one objector was able to personally appear alongside their counsel, but the district court did not ask him a single question. *See* App. 757, 760; R. Doc. 1640, at 37, 40.

## III. The District Court's Settlement Approval Order

Following the same path it took in approving the earlier settlements in this case, the district court requested and adopted the proposed order provided by Settling Plaintiffs' counsel with minimal edits three days after the fairness hearing. *Compare* App. 633-720; R. Doc., 1622, at 1-88 *with* Mot. Ex. 2 (Proposed Order).

The order overruled Mullis's objection and approved the class settlements. App. 691-702; R. Doc. 1622, at 59-70. The court began its analysis emphasizing the "particularly strong" "presumption in favor of settlements." App. 639-40; R. Doc. 1622, at 7-8. It also determined that Mullis and other objectors had waived their objection by failing to appear in person at the fairness hearing. App. 649; R. Doc 1622, at 17.

Addressing Mullis's objection, the order cribbed nearly verbatim portions of the Settling Plaintiffs' earlier appellee brief filed in this Court defending their settlements with other defendants. As in that

brief, the district court concluded that the releases extinguished Mullis's claims related to his homebuying transaction because that transaction shared the same factual predicate as his separate home-selling transaction. App. 691-94, 700-02; R. Doc. 1622, at 59-62, 68-70. The district court also echoed the Settling Plaintiffs' appellate arguments in holding that the settlements satisfied Rule 23's adequacy requirement because, purportedly, no conflict existed between class members who received compensation for all their claims and those who must forfeit their separate homebuying claims for what appears to be nothing. App. 694-99; R. Doc. 1622, at 62-67. When facing the fact that the settling parties had omitted any allocation plan to disguise the bait-and-switch for homebuying class members, the district court punted the issue to a separate "allocation phase" with a second round of notice to class members where they could exercise a second "right to object and/or file a claim," and presumably yet another appeal to this Court. App. 699; R. Doc. 1622, at 67.

## SUMMARY OF THE ARGUMENT

In 2018, Congress codified Rule 23(e)(2), containing substantive and procedural guidelines for evaluating class settlements. It requires

all class settlements to satisfy four requirements: (1) that class representatives and counsel adequately represented absent class members; (2) that the settlement was negotiated at arm's length; (2) that the relief to class members is adequate; and (4) that the settlement treats class members equitably relative to one another. Fed. R. Civ. P. 23. If just one condition is not met, the settlement cannot be approved. Here, the settlements fail not just one, but three of these requirements.

The district court ignored the intraclass equity pillar. It was required to examine "whether the scope of the release may affect class members in different ways that bear on the apportionment of relief" when determining whether the settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D) & Committee Notes—2018 Amendment. The district court simply did not do that. Instead, it applied a presumption of fairness—a practice specifically *prohibited* by the 2018 Amendment—and determined that the pre-approval analysis could be punted to some post-approval process not recognized by Rule 23.

The district court similarly failed to ensure that the settlements' releases did not violate the "identical factual predicate" doctrine that

17

sets strict due process limits on Rule 23 representation. Under that doctrine, class counsel representing absent class members cannot give away claims for separate injuries arising from transactions or occurrences that they never actually litigated. Even if the defendant's actions are the same, a class settlement cannot release unpleaded claims that require *plaintiffs* to establish separate facts about their actions or injuries that differ from the plaintiff-specific facts required for the pleaded claims. In this case, the separate homebuying injuries that class members suffered arose from an entirely different set of transactions in which they purchased homes and suffered damages through higher home prices. Class counsel in this case never alleged these injuries and never conducted fact or expert discovery into them to determine their actual value. Nevertheless, they forfeited claims based on those valuable injuries without apparently any inkling about whether or how to compensate class members for these separate and compensable injuries.

The Settling Plaintiffs incorporated this "same factual predicate" rule into the releases themselves. *E.g.*, App. 277-78; R. Doc. 1458-1, at 5-6. But when they drafted the approval order, they exceeded this

restriction to craft an injunction barring all claims related to home purchases. There, the Appellees carefully chose more expansive language—nowhere present in the settlements or class notices— enjoining claims where class members "purchased a home." App. 710-11; R. Doc. 1622, at 78-79.

The district court's errors interpreting the "identical factual predicate" rule also resulted in its truncated and erroneous application of Missouri law when interpreting the contracts. Because those contracts limit the releases to claims sharing the "same factual predicate," they, by definition, do not release homebuying claims.

These deficiencies demonstrate that class counsel's representation of homebuyer claims was wholly inadequate. The district court's conclusion that adequacy is satisfied so long as every class member receives some financial compensation contravenes the facts of *Amchem* and *Ortiz*, which found inadequate representation despite the settlements promising compensation for every class member. As the Second Circuit has recognized, class counsel fails to provide adequate representation when its general representation of a single class results in settlements that irrationally favor a minority of the class at the

expense of the majority's interests. As explained above, no rational explanation can justify providing complete compensation for every claim held by the class minority while forfeiting the majority's valuable homebuying claims without any indication they will receive a penny of relief for those claims.

Finally, the district court's imposition of a waiver penalty against Mullis exceeded the district court's inherent power. "[T]he exercise of an inherent power must be a reasonable response to the problems and needs confronting the court's fair administration of justice." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (internal quotation marks omitted). The district court never explained what problem or need it faced in adjudicating the objections, let alone how Mullis's personal appearance in court satisfied that need.

Mullis followed the exact procedure laid out in the class notice he received; in fact, he went above and beyond the requirements laid out by having his counsel appear at the fairness hearing. That notice specifically informed him that he did not need to attend the fairness hearing, and he reasonably relied on that information. Contradicting this, the district court entered an order imposing a new personal

appearance requirement just three weeks before the hearing. Nothing changed between Mullis's compliant objection filed on October 28, 2024, and the district court's order one week later requiring his appearance. The district court identified no deficiency in Mullis's objection or any conduct that his personal appearance would remedy. And Mullis's inability to attend the hearing due to work obligations cast no doubt upon the veracity or good faith of his objection.

Because the district court contravened Rule 23, Missouri contract law, and exceeded its inherent authority to sanction a party, Mullis respectfully requests reversal of the district court's order and the exclusion of homebuyer claims from the settlements or the appointment of separate representation for homebuyers in negotiations and settlements in this case.

## ARGUMENT

## I.    Standard of Review

While orders approving class settlements are reviewed for abuse of discretion, by definition a "district court abuses its discretion if it makes a legal error." *ACLU of Minnesota v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011). For this reason, a "district court's

interpretation and conclusions of law are reviewed de novo." *Black Clawson Co. v. Kroenert Corp.*, 245 F.3d 759, 763 (8th Cir. 2001). Because the issues on appeal concern the district court's interpretation of legal rules like the "identical factual predicate" doctrine and intraclass conflict precedent, the district court's legal interpretations do not merit deference.

This critical, plenary review has special purchase here where the district court copied verbatim the proposed order that itself aped large portions of the Settling Plaintiffs' earlier appellee brief before this Court. *Askew v. United States*, 680 F.2d 1206, 1209 (8th Cir. 1982) ("we disapprove of the court placing its imprimatur on such proposed findings by wholly adopting them as the court's own"). *But see Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (reserving the question whether verbatim adoption of *legal conclusions* changes the standard of review where the district court "rejected several pages of findings" while noting that "verbatim adoption of proposed *findings of fact* does not change the standard of review" (emphasis added)).

This Court also reviews de novo district court interpretations of class settlements, including interpretations of releases. *Cromeans v. Morgan Keegan & Co.*, 859 F.3d 558, 566 (8th Cir. 2017).

## II. The Settlements Failed to Satisfy Rule 23(e)(2)

Rule 23's requirements protect absent class members and "demand undiluted, *even heightened*, attention in the settlement context." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) (emphasis added). When evaluating a class settlement, "rigorous adherence to those provisions" must not give way to "uncritical adoption by . . . the District Court" of the proposed agreement. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 848-49 (1999).

As it did with the previous settlements in this case, the district court failed to apply Rule 23(e)(2)'s pronouncements when examining the settlements here. Contrary to the Supreme Court's repeated holdings that blanket presumptions have no place under Rule 23, the district court approached the settlements here "with a presumption in their favor," calling them "presumptively valid." App. 639-40; R. Doc. 1622, at 7-8. Consistent with the Supreme Court's criticism of lax settlement approval standards, Congress also rejected the concept of

presumptive fairness in the 2018 Amendment to Rule 23(3)(2) by codifying the four necessary elements for settlement approval. No matter what presumptions courts may have permitted "[p]rior to Rule 23(e)(2)'s codification of the core factors," the post-2018 "Rule 23(e)(2) prohibits courts from applying a presumption of fairness to a settlement agreement." *Moses v. New York Times Co.*, 79 F.4th 235, 243 (2d Cir. 2023); *accord In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 776 (9th Cir. 2022); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1049 n.12 (9th Cir. 2019); *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1093 (11th Cir. 2023).

Uncritical adoption of the proposed settlement resulted in two errors: First, the district court failed to apply the letter of the intraclass equity requirement as laid out in Rule 23(e)(2)(D), applying a truncated analysis instead based on outdated pre-2018 precedent. Second, the district court misinterpreted the adequacy requirement of Rule 23(e)(2)(A), ignoring class counsel's conflicting interest and what the record indicates to be inadequate, if any, compensation for the class members' homebuying claims.

## A. The District Court Misapplied the Intraclass Equity Requirement

Rule 23(e)(2)(D) requires courts to determine whether "the proposal treats class members equitably relative to each other." The Committee Notes explain that paragraph (D) requires investigation into "whether the apportionment of relief among class members takes appropriate account of differences among their claims." Fed. R. Civ. P. 23, Committee Notes on Rules—2018 Amendment. It further directs courts to pay close attention to the release language itself to determine "whether the scope of the release may affect class members in different ways that bear on the apportionment of relief." *Id.*

The district court's analysis of this factor ignored this guidance from the Committee. When analyzing intraclass equity, the district court held that "all that is required" is that the prospective "practice change relief applies to all Class members" and that all class members be "eligible to submit and receive compensation for a claim." App. 644; R. Doc. 1622, at 12. So much for rigorous scrutiny of the "scope of the release." The district court does not even mention it when discussing this factor.

By their plain terms, the releases clearly "affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23, Committee Notes on Rules—2018 Amendment. Some class members never bought homes during the class period because, for example, they sold property that they inherited or sold investment or surplus properties. These class members are promised compensation for every real estate transaction subject to the release.

The majority of class members, however, both bought and sold homes. And many of these class members sold less expensive homes to buy more expensive homes or sold only their primary home while purchasing multiple investment properties. Because broker commissions function as a percentage of the home sale price, these purportedly released claims are arguably *more valuable* than the home-selling claims. Yet, the record evidences that these class members will not receive adequate compensation (or more likely, anything at all) for these claims. *See* Claim Form, App. 631-32; R. Doc. 1595-7, at 100-101. In other words, the release leverages the forfeiture of every class member's homebuying claim to subsidize the full compensation of a minority of class members.

When confronting this inequity, the district court failed to substantively address the problem. Its observation that "most Class members had possible claims both as home sellers and homebuyers" only highlights the patent unfairness of the release providing greater compensation for the few. App. 691; R. Doc. 1622, at 59. The district court provided no justification for this result: it identified no rationale to explain why a class member who suffered fewer injuries on fewer transactions should receive disproportionate compensation at the expense of "most Class members." This irrational advantage given to the minority of the class who never purchased homes is a quintessential example of intraclass inequity.

The district court also failed to explain why this inequity would be justified by the Defendants' insistence on the blanket release of all claims "for the same alleged antitrust conspiracy." App. 688; R. Doc. 1622, at 56. Whether or not the Defendants engaged in a single antitrust conspiracy has nothing to do with the allocation decision, much less explain away the inequities.

The district court's punting of its substantive analysis of the intraclass equity factor to the allocation phase does not find any support

in the law. App. 699-700; R. Doc. 1622, at 67-68. The district court's proposal of "a second notice to Class Members, followed by a right to object and/or file a claim" cannot be reconciled with the text of Rule 23(e) requiring a substantive intraclass equity determination *before* settlement approval. App. 700; R. Doc. 1622, at 68 (quoting *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019)).

The plain language of Rule 23 after 2018 simply does not allow bifurcated settlement approval. Instead, district courts "may approve [a settlement] *only after* . . . considering whether . . . the proposal treats class members equitably relative to each other" and examining the "proposed method of distributing relief." Fed. R. Civ. P. 23(e)(2)(C)(ii) & (D) (emphasis added). This language establishes that district courts lack the discretion to approve first and ask questions later (or perhaps never at all). Instead, searching examination of intraclass equity and the distribution plans that bear on that equity must occur before final approval.

The relevant authorities support this reading of the Rule. The Committee Notes explain that this pre-approval intraclass equity factor

examines "the apportionment of relief among class members." Indeed, the leading treatise favored by the Appellees explains that the intraclass equity factor in Rule 23(e)(2)(D) examines "the equity of [the] distribution across the class" of the settlement relief, and a "distribution of relief that favors some class members at the expense of others may be a red flag." 4 Newberg and Rubenstein on Class Actions § 13:56 (6th ed.). And though the treatise suggests that "fine details in allocation may be deferred," big-picture matters, like whether homebuying claims will recover *anything*, cannot. *Id.* § 13:51.

The Rule's prescription makes good sense. Rule 23(e)(2) works hand-in-glove with the Rule's neighboring paragraphs on settlements. Those paragraphs lay out the procedures for providing settlement notice to class members, objecting to the proposed settlement, and holding a fairness hearing before approval. Rule 23(e)(1)-(2), (5). If a critical allocation decision is deferred until after final approval, the Rule does not provide adequate procedural safeguards to provide notice to class members for them to examine the allocation decision and object before and during a hearing before the court. Requiring multiple rounds of

approval, objections, and appeals runs against Rule 23's elegant and efficient procedural safeguards and needlessly wastes judicial resources.

The existence of multiple Defendants entering settlements at different times does not excuse this failure. To be clear, Mullis does not argue that the Appellees must determine and publish in advance the recovery amount (or a detailed proxy) that each class member could expect. But the Rule is clear that before approval the proposal must provide sufficient information for class members and a reviewing court to determine whether the settlements will "treat[] class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). Appellees here needed to demonstrate that homebuyers and home sellers would receive equitable treatment. They utterly failed to do so. Instead, the absence of a distribution plan, the claim forms asking only about home sales, and the absence of any fact or expert discovery into homebuyer damages support the conclusion that homebuyers' claims receive nothing. *See* Claim Form Section B, App. 631; R. Doc. 1595-7, at 100.

## B. The Releases Improperly Extinguish Homebuyer Claims Without an Identical Factual Predicate

Courts examine releases for overbreadth using the identical factual predicate rule. As the name suggests, under the rule a settlement cannot extinguish viable, unpleaded claims that lack an identical factual predicate with the pleaded claims. *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 377 (1996); *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013). The rule provides a rigid test to ensure Rule 23 representation meets "due process" requirements, offering through its inquiry a "more instructive" means of policing due process than the traditional "adequate representation" inquiry. 6 Newberg and Rubenstein on Class Actions § 18:19 (6th ed.). Here, the district court ignored that safeguard, improperly allowing class counsel to extinguish homebuying claims that plainly arise from and depend upon different factual predicates.

Circuits throughout the country follow the blueprint laid out by the Second Circuit when it designed the test in *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981). *National Super Spuds* recognized that Rule 23 representation could not exceed normal preclusion principles without violating due process.

Consequently, class counsel operating under the strictures of Rule 23 lack authority to release claims relying on different plaintiff-focused facts that go beyond the "same transactions or occurrences" actually alleged and litigated in the settled case. "If a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." *Id.* at 18. Borrowing its "parallel test" from preclusion law, the identical factual predicate rule trains its analysis on "claims arising out of the same transaction and occurrence" as those litigated by the settling class action. 6 Newberg and Rubenstein on Class Actions § 18:19 (6th ed.).

On the most fundamental level, homebuying claims do not share identical factual predicates with home-selling claims because buying one home and selling a different home are two distinct transactions. These two distinct groups of transactions involve different material facts (retaining a buyer-broker and shopping for and purchasing a home instead of retaining a selling-broker and selling a home), on different dates, with a different type of injury (a seller paying anticompetitive buyer-broker fees out of the proceeds of the home sale in the first

instance versus a buyer paying anticompetitive buyer-broker fees through higher home prices).

Those differences inform the legally required factual predicates separating homebuying claims from home-selling claims (i.e., the fact of purchase; the involvement in the conspiracy of brokers working on the purchase; and an inflated home price caused by the conspiracy).

Most critically, homebuyers' claims turn on a separate injury distinct to homebuying transactions: overpaying for their homes via the inflated commission rates baked into the price (as opposed to supracompetitive broker fees they paid directly for different homes that they sold in different transactions). *See* App. 572; R. Doc. 1561-7, at 8 (Statement of Interest of the United States) ("the buyer-broker commission has a very real cost to homebuyers, who ultimately pay through higher purchase prices").

These "time, space, origin, or motivation" factors are the hallmarks for determining whether there is identity between transactions. Restatement (Second) of Judgments § 24 (1982). The case law confirms that these transactional facts are also the hallmarks for the identical factual predicate test. Here, while these transactional facts

about class members' home purchases form the necessary predicates for the inflated home-price injuries and homebuying claims, they are totally irrelevant to home-selling claims.

Unsurprisingly in light of these different predicates, nowhere do the complaints in the settled cases litigate or even allege any facts about class members' home-purchase transactions. Instead, Appellant Mullis and other homebuyers pursued those claims pertaining to separate homebuying transactions in separate litigation highlighting buyers' unique informational disadvantages compared to sellers due to NAR rules permitting brokers to tell buyers that their services were "free" and blocking buyers from viewing commission rates online.

And courts throughout the country recognize that this transaction-based constraint forms the core of the identical factual predicate safeguard. The district court ignored this constraint, but provided no limiting principle restricting class counsel's powers to extinguish class members' claims. The unified precedent across the country runs to the contrary. *E.g.*, *Hesse v. Sprint Corp.*, 598 F.3d 581, 591 (9th Cir. 2010) ("dismissal [after settlement] is res judicata and bars a later lawsuit on the *same transaction or occurrence*") (internal

quotation mark omitted) (emphasis added); *Nottingham Partners v. Trans-Lux Corp.*, 925 F.2d 29, 33 (1st Cir. 1991) (class release barred claims because they "*arose out of the same transaction* as the claims in the class action") (emphasis added). Even settling defendants have recognized that the same-transaction test forms the outer limits of what claims a class settlement can release. *See Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 393–94 (1996) (Ginsburg, J., concurring in part and dissenting in part) (noting that the party enforcing the release had "urged" the Ninth Circuit to adopt the "'same transaction' . . . test").

The structure of this inquiry ensures equitable results for plaintiffs and defendants. By focusing at the transactional level between plaintiffs and defendants, the rule serves the twin interests of providing the maximum permissible peace to settling defendants without trampling the rights of absent class members. It ensures that a settlement can cover every conceivable injury arising from particular transactions between a plaintiff and defendant in order to prevent double recovery for injuries resulting from identical transactions. But it does not allow a defendant to buy peace that prevents *any* recovery on

separate transactions never litigated or alleged in the settling lawsuit (and, indeed, separately litigated elsewhere).

This aim on plaintiff-focused transactions unifies the case law and avoids an unnecessary and unjustified circuit split. Contrary to the district court's reasoning, nothing in this Court's precedent allows overbroad releases to cover separate transactions not litigated by class representatives and counsel. Specifically, this Court's decisions in *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187 (8th Cir. 1993), and *In re General American Life Insurance Co. Sales Practices Litigation*, 357 F.3d 800 (8th Cir. 2004), do not conflict with the unified case law because the released claims in these cases covered the same transactions that were litigated in the settled cases.

In *Thompson*, the objector rightly lost because she merely asserted different legal theories covering the same securities transactions that were the focus of the released claims. The released claims from the settled case had alleged federal securities claims based on "material misrepresentations or omissions" in the sales materials provided to the class about certain investments purchased by class members. *Thompson*, 992 F.2d at 188. The objector brought claims sounding in

state law for her exact same investment purchases, including "negligence, fraud . . . , breach of fiduciary duty, breach of agent's duty," as well as a separate claim under federal securities law. *Id.* at 189. Those new claims clearly shared an identical factual predicate with the settled claims because they sought double recovery for the same injury resulting from the same transactions and the defendant's same misconduct.

The same was true in *General American*. There, the plaintiff asserting new claims alleged that she suffered injury because she paid inflated insurance premiums due to the defendant's "omissions and non-disclosures" that its "modal" (read: monthly) billing option "meant that the amount actually paid each year was . . . greater" than if she paid annually. *General American*, 357 F.3d at 802. Although the settling plaintiffs had not alleged this specific misconduct, the settled allegations plainly covered the same premium payment transactions as the modal billing allegations. *Id.* at 803. As this Court recognized, the settled lawsuit alleged "various misrepresentations and other wrongdoings" related to overpaid "premium charges," which necessarily "includes as a subset premiums paid in accordance with a modal-billing

option." *Id.* at 802-03. Again, the release rightly prevented double recovery for injuries resulting from the same transactions between the plaintiff and defendant.

The district court similarly misinterpreted out-of-circuit cases. The Appellees wrongly suggest that the Second Circuit narrowed the *National Super Spuds* identical factual predicate doctrine in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005). Contrary to this argument, *Wal-Mart* (like *Thompson* and *General American*) again involved claims with identical factual predicates built on identical credit card transactions; the new claims just shifted the legal theory of recovery. *Id.* at 107-08. The *Wal-Mart* objectors argued that the releases could not extinguish their "horizontal boycott" claims because the plaintiffs in the settling case had pursued only "tying" claims related to the defendants' alleged misconduct in the credit card market. *Id.* at 108. In making this argument, the objectors emphasized the difference in the "damage theory" between the settling case and their claims. *Id.*

The Second Circuit rightly rejected this, understanding that the "overlap between elements of *claims* is not dispositive" because the construction of a claim and the proper measure of damages goes to the

legal theory. *Id.* at 108. A different legal theory with different damages models could not save the objectors because their claims rested on the same "credit card transactions." *Id.* at 101, 107-08. Once again, the rule properly prevented double recovery from injuries resulting from the same transactions.

This lawsuit was brought only on behalf of sellers, asserting only claims relating to class members' sales of their homes. Certification in this lawsuit explicitly extended only to transactions where class members sold their homes. *See* App. 636-37; R. Doc. 1622, at 4-5. And any final judgment in this action must also be limited to home-selling transactions. Class counsel thus ran afoul of the identical factual predicate rule by changing the scope of representation at the settlement-approval stage to encompass a much larger series of transactions distinct from those alleged and litigated in this lawsuit.

Newberg and Rubenstein recognize that exposing this sleight of hand lies at the center of identical factual predicate inquiry. As they explain, this test "safeguards the class from the possibility that its representatives might compromise claims that are tangential to their own but central to those of the class." 6 Newberg and Rubenstein on

Class Actions § 18:19 (6th ed.). Here, the homebuying claims occupy a central place for the many settlement class members who both bought and sold homes. Those claims have merit, as district courts have recognized. But they are clearly tangential to the concerns of class counsel in this case who settled them for what appears to be nothing.

## C. Class Counsel Provided Inadequate Representation for Class Members' Homebuying Claims

As the substantive defects in the settlements evidence, class counsel's representation of homebuyers' claims was wholly inadequate. Under Rule 23 and binding precedent, the adequate representation requirement examines how class counsel treated competing groups within a class. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("adequacy inquiry . . . serves to uncover conflicts of interest"). Here, the district court ignored the evidence indicating that class counsel gave no thought to, and provided no representation for, class members' homebuying claims.

It bears repeating that class counsel *never* pursued homebuying claims at any stage of this litigation: homebuying claims were always litigated separately in a separate action. *See* App. 217, 258-59; R. Doc.

759, at 2, 43-44, ¶¶ 1, 118-20. Nor did class counsel ever analyze or pursue damages for class members' homebuying claims, including throughout settlement. *See* App. 631-32; R. Doc. 1595-7, at 100-101. Only *after* Mullis raised his objection did class counsel argue that they provided any representation—adequate or otherwise—for homebuying claims. Class counsel suggest that they knowingly forfeited those claims in order to achieve global peace with the settling Defendants, but none of the multiple declarations supporting this argument comes from a named Plaintiff explaining that class counsel ever apprised them that homebuyer claims existed or that a named Plaintiff knowingly agreed to forfeit homebuying claims as part of the settlements.

Under class counsel's deficient bargain, those homebuyer class members must, at *best*, share the value of their claims with only a small subset of heirs and other home-selling-only class members guaranteed compensation for all of their injuries. Worse and more likely, homebuyer class members are not sharing; they are receiving nothing for their homebuying claims. That subsidy is patently unfair and inconsistent with Rule 23's adequate representation requirement.

This arrangement plainly contravenes the case law on adequate representation. When read in harmony, these cases—*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997), *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), and *In re Literary Works in Electronic Databases Copyright Litigation*, 654 F.3d 242 (2d Cir. 2011)—establish that class counsel fail to adequately represent the class when they sacrifice valuable claims of the majority of the class in order to provide a subsidy to a favored minority.

Examining these cases together demonstrates how the Appellees' distinctions for one case are inconsistent with the reasoning in other cases. For example, the district court distinguished *Literary Works* by arguing that it applies only where class members run the risk of receiving zero compensation for *all* of their claims—not just half of their valuable claims. App. 698-99; R. Doc. 1622, at 66-67. In other words, the district court concluded that so long as all class members receive some financial compensation, then a settlement satisfies Rule 23.

But that supposed rule cannot be reconciled with *Amchem*, where the settlement ensured that all class members (even disfavored future-asbestos injury members) would receive financial compensation for

their physical injuries because "each defendant 'ha[d] shown an ability to fund the payment of all qualifying claims' under the settlement." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 638 (1997) (Breyer, J., concurring in part and dissenting in part) (quoting the district court's factual determinations); *id.* at 626 (majority opinion) ("petitioners' assets suffice to pay claims under the settlement"). Under *Amchem*, even when all class members are assured compensation, representation is inadequate where unitary class counsel improperly "served generally as representative for the whole, not for a separate constituency" and made "essential allocation decisions" for disparate groups—especially where valuable "claims are extinguished with no compensation." *Id.* at 627 (majority opinion).

The district court's misinterpretation of *Amchem* improperly limits this precedent to its facts. Under the district court's reasoning, *Amchem* applies only to mass tort cases involving disparate injuries among class members—something at odds with *Literary Works*, which warned against allowing the "stark" facts of *Amchem* to distract courts away from its guiding principles. 654 F.3d at 251. Even worse, the district court misrepresented the facts in *Amchem* to argue that its

settlement would have resulted in the likelihood that some class members "(numbering in the hundreds of thousands) would receive nothing." App. 695; R. Doc. 1622, at 63. But the Supreme Court's explicit reasoning was entirely to the contrary—it conceded and did not disturb "the District Court's finding that petitioners' assets suffice to pay claims under the settlement." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 (1997); *id.* at 638 (Breyer, J., concurring in part and dissenting in part) (quoting the district court's finding that the defendants had "shown an ability to fund the payment of *all qualifying claims*" made by class members bound by the settlement) (emphasis added).

Class counsel now ask this Court to trust them to account for homebuyer interests at the allocation phase. But nothing in the history of this litigation indicates that class counsel has earned that trust. Indeed, if class counsel had shouldered its representational obligations throughout the settlement process, then the claim forms would already show evidence of this commitment. Instead, those forms ask only about class members' home sales. *See* Claim Form Section B, App. 631; R. Doc. 1595-7, at 100.

If this Court does determine that the settlements must account for homebuyers' claims in order to release them, Mullis and his counsel have demonstrated the proper commitment to these claims through their prosecution of homebuyers' claims throughout the country and retention of skilled experts able to determine the value of those claims.

## III.   The Releases Do Not Touch Mullis's Homebuying Claims

The district court correctly recognized that the releases incorporate the identical factual predicate doctrine. App. 691; R. Doc. 1622, at 59. Because the settling parties used the "same factual predicate" legal term of art, governing Missouri law requires this Court to "give the words used by them their established legal meaning." *Keltner v. Keltner*, 589 S.W.2d 235, 238 (Mo. 1979). By incorporating this doctrine, the contracts must be read as excluding homebuying claims because the identical factual predicate doctrine forbids their release for the reasons stated above.

Instead, the district court interpreted the releases in a way that is contrary to this Missouri law and the settlements' terms. It reasoned that because the "Released Claims" paragraphs use the phrase "any or all" before "same factual predicates," the Appellees bargained away

homebuying claims and any other conceivable claim that might share one factual predicate with the litigated claims. App. 692; R. Doc. 1622, at 60. On their reading, the releases would extinguish all claims that share *any* single factual predicate with a pleaded claim. This would impermissibly read the "same factual predicates" term of art out of the contract and extinguish all manner of claims only tangentially related to this lawsuit—far beyond those subject to preclusion under a final judgment after trial. Under Missouri law, however, a "construction that attributes a reasonable meaning to all the provisions of the agreement is preferred to one that leaves some of the provisions without function or sense." *Dunn Indus. Grp., Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 428 (Mo. 2003). If the parties truly intended to extinguish all claims with any shared factual predicate with those alleged here, they surely would have chosen a more natural and less legalistic phrasing to do so.

One need look no further than another settlement provision that the district court copied to carve out an exception to its injunction to see that the Appellees knew precisely how to exclude home purchasing claims with broader, less legalistic language. *Compare* App. 277; R. Doc.

1458-1, at 5, *with* App. 290-91; R. Doc. 1458-1, at 18-19. That relevant text provides, "The release does not extend to any individual claims that a class member may have against his or her own broker or agent based on a breach of contract, breach of fiduciary duty, malpractice, negligence or other tort claim, other than a claim that a class member paid an excessive commission or home price due to the claims at issue in these Actions." App. 290-91; R. Doc. 1458-1, at 18-19. On its own terms, this explicit carve-out to release claims tied to a homebuyer paying an "excessive . . . home price" applies only to claims against third-party brokers, *not* the Defendants. This provision shows that the settling Appellees knew how to carve out claims related to home purchases in the release section but chose not to do so with respect to the Defendants, likely out of fear of creating an unenforceable contract term that unlawfully violated the identical factual predicate rule.

The natural, reasonable interpretation of the "any or all" term ties it to the fuller phrase, which provides that the released claims include those sharing "any or all of the same factual predicates *for the claims alleged in the Actions*." App. 277; R. Doc. 1458-1, at 5 (emphasis added). In light of the italicized portion, the better interpretation construes

"any or all" to mean that the Released Claims cover claims based on the same factual predicates of any of the separate claims alleged in the Action. In other words, this phrase appears designed to foreclose the arguments made by the objectors in *Wal-Mart*, *Thompson*, and *General American* who sought double recovery arising from the same transactions based on new legal theories, not claims arising from separate transactions.

## IV. Mullis Preserved His Objection

The district court's imposition of a waiver sanction against Mullis for not appearing in person at the fairness hearing (he appeared through his counsel instead) exceeded its lawful authority. The court identified no federal rule or statute that provided it with the power to sanction Mullis for failure to personally appear at the settlement approval hearing. Instead, the district court relied on its inherent authority. *See* App. 648-49; R. Doc. 1622, at 16-17.

"[T]he exercise of an inherent power must be a 'reasonable response to the problems and needs' confronting the court's fair administration of justice." *Dietz v. Bouldin*, 579 U.S. 40, 45 (2016) (quoting *Degen v. United States,* 517 U.S. 820, 823–824 (1996). An

inherent power "must be exercised with restraint" to avoid the "risk [of] undermining other vital interests." *Dietz* 579 U.S. at 48. In the parallel case, the district court explained that it ordered personal appearances by all objectors because it received "a somewhat alarming objection that accused me of criminal acts," which made it "somewhat suspect about objectors in this case given the fact that I have to have the U.S. Marshals monitoring correspondence." Mot. Ex. 1 at 3. This problem of one disgruntled objector, however, bears no nexus to a requirement that innocent objectors like Mullis appear in person before the district court, particularly when Mullis was represented at the hearing by "good lawyers," *id.* at 4:10, subject to the district court's sanctioning power. *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764 (1980).

Just last year this Court reversed a district court's finding of waiver with respect to a settlement objection, noting that a "district judge ought not try to insulate his decisions from appellate review by preventing a person from acquiring a status essential to that review." *In re T-Mobile Cust. Data Sec. Breach Litig.*, 111 F.4th 849, 857-58 (8th Cir. 2024), *quoting Robert F. Booth Trust v. Crowley*, 687 F.3d 314, 318 (7th Cir. 2012). This Court held that a district court improperly abuses

its discretion when it strikes an objection to a class action settlement where there is no evidence the "objection is frivolous," that the objector has "acted vexatiously," has "broken any rules," or has "acted unethically." *Id.* The same is true in this case, where the evidence is even stronger that the district court was trying to protect Appellees' own interests rather than those of the certified class.

Beyond the order itself, the sanction against Mullis for his inability to comply with the order presents a separate ultra vires action exceeding the court's inherent power. In the analogous Rule 37 sanctions context, the Supreme Court has explained that a court can strike a party's filing only where the party's failure to comply with a court order "create[s] a presumption of fact as to the bad faith and untruth" of the sanctioned party's statements. *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705 (1982) (quoting *Hammond Packing Co. v. State of Ark.*, 212 U.S. 322, 351 (1909)). Here, nothing about Mullis's inability to attend the hearing due to work obligations creates a presumption of fact that his objection was untruthful or filed in bad faith, particularly when his counsel was present to at the fairness hearing to address any concerns the court

50

may have had. The court did not ask Mullis' counsel any questions about Mullis other than whether he was present in the courtroom.

It bears emphasis that Mullis followed the exact procedure laid out in the long form notice provided to absent class members. That notice provided the following process: "To object, you must file or send a written objection to the Court, as instructed by the Court, by October 28, 2024 . . . ." App. 611-12; R. Doc. 1595-7, at 80-81. The notice also directed the objections to be filed with the district court and sent to Appellees' counsel. App. 611-12; R. Doc. 1595-7, at 80-81. Elsewhere, it removed any doubt about this requirement. It answered the specific question: "Do I have to come to the hearing? No. . . . If you send any objection, you do not have to come to court to talk about it. As long as you filed and mailed your written objection on time, the Court will consider it. You may also pay your own lawyer to attend if you wish." App. 613; R. Doc. 1595-7, at 82.

Mullis did exactly as the district court instructed, and he relied on this when filing his objection on October 28, 2024 and planning his work schedule for the following month. Enforcing the district court's arbitrary and unlawful order on November 4, 2024 to require personal

appearances by all objectors at a hearing just three weeks later would have caused Mullis to miss work and suffer prejudice. App. 765; R. Doc. 1640, at 45.

## CONCLUSION

Appellant James Mullis respectfully asks this Court to reverse the district court's judgment for its failure to follow the Rule 23(e)(2) guidelines that prevent irrational, inequitable treatment among different class members. To adequately protect class members with valuable homebuyers' claims, Mullis respectfully requests that this Court exclude homebuyer claims from any home-sellers' settlement.

Alternatively, Mullis respectfully requests that this Court appoint Objector's counsel to represent homebuyer claims in these and any future negotiations or settlements in this case.

Respectfully submitted,

*/s/ Ryan Z. Cortazar*

George A. Zelcs
Randall P. Ewing, Jr.
Ryan Z. Cortazar
**KOREIN TILLERY LLC**
205 N. Michigan Ave., Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Vincent Briganti
Margaret MacLean
Noelle Forde
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
vbriganti@lowey.com
mmaclean@lowey.com
nforde@lowey.com

*Counsel for Objector-Appellant*

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a). This brief contains 9,720 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen (14) point Century Schoolbook font.

Dated:   April 21, 2025

*/s/ Ryan Z. Cortazar*
Ryan Z. Cortazar
One of the Attorneys for Objector-
Appellant

## CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief in non-scanned PDF format. I hereby certify that the file has been scanned for viruses and that it is virus-free.

*/s/ Ryan Z. Cortazar*
Ryan Z. Cortazar

## CERTIFICATE OF SERVICE

The undersigned attorney for Objector-Appellant James Mullis certifies that on April 21, 2025, an electronic copy of the Brief of Objector-Appellant was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: April 21, 2025          */s/ Ryan Z. Cortazar*
                                        Ryan Z. Cortazar